## UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF WEST VIRGINIA

**CHRISTOPHER ALEXANDER SHY,**

        **Plaintiff,**

**v.**                                                          **Case No. 1:18cv153**
                                                               **(Judge Kleeh)**

**TAMERA KESSEL, Nurse Practitioner;**
**RHONDA SKIDMORE, R.N.;**
**JENNIFER BENNETT, Medical**
**Assistant; CHRISTINA STILLWELL,**
**M.A.,**

        **Defendants.**

## REPORT AND RECOMMENDATION

### I. Procedural History

On August 9, 2018, the *pro se* Plaintiff, an inmate then-incarcerated at the Eastern Regional

Jail[1] ("ERJ") in Martinsburg, West Virginia, initiated this case by filing a filing a civil rights

complaint, originally against Prime Care Medical – Eastern Regional Jail and Prime Care Medical

staff pursuant to 42 U.S.C. §1983, alleging failure to timely or properly treat a potentially life-

threatening condition, testicular cancer. ECF No. 1. Along with his complaint, Plaintiff filed a

motion to proceed as a pauper with supporting documents. ECF Nos. 2, 3, 4.  The copy of

Plaintiff's Prisoner Trust Fund Report ("PTAR") did not have a copy of the account's Ledger

Sheets attached. Id. By Order entered August 20, 2018, the Prison Trust Account Officer was

directed to produce the Ledger Sheets to the account within twenty-one days.  ECF No. 8.  On

August 21, 2018, Plaintiff filed a supplement to his complaint; a motion for appointed counsel;

and a motion seeking an extension of time to file the Ledger Sheets and for a copy of a § 1983

---

[1] Plaintiff is presently incarcerated at the Northern Regional Jail in Moundsville, West Virginia.

packet.  ECF Nos. 9, 10, 11. On August 21, 2018, the Clerk of Court sent Plaintiff the requested §

1983 packet.  See ECF No. 11-2. By Order and Notice entered August 23, 2018, Plaintiff was

granted leave to file an amended complaint to name a person or persons actually amenable to suit

under § 1983 and the Clerk was directed to send him a copy of the court-approved form to use.

ECF No. 12.

On September 4, 2018, Plaintiff's motion for an extension of time and for the § 1983 packet

was denied as moot [ECF No. 16]; by separate Order entered the same day, his motion for

appointed counsel was denied as well.  ECF No. 17.  Plaintiff filed his amended complaint later

that day, along with another motion for appointed counsel and a letter to the Clerk/District Judge.

ECF Nos. 18, 19, 20.

On September 5, 2018, an initial review pursuant to Local Rule of Prisoner Litigation

Procedure ("LR PL P") 2 was conducted and the Defendants were ordered to answer the Amended

Complaint.  ECF No. 21.  Summonses were issued for the named defendants. Id. By Order entered

September 11, 2018, Plaintiff was granted permission to proceed as a pauper without payment of

an initial partial filing fee, although he was assessed the full fee.  ECF No. 26.

On September 28, 2018, the Defendants filed a motion for an extension of time to answer

the amended complaint.  ECF No. 30.  On October 1, 2018, Defendants' motion was granted in

part. ECF No. 31. On October 8, 2018, the Defendants filed a Motion to Dismiss Amended

Complaint and Alternative Motion for Summary Judgment with a memorandum in support,

attaching copies of some of Plaintiff's medical records.[2] ECF Nos. 32, 33. On October 9, 2018,

because Plaintiff was proceeding *pro se*, a Roseboro Notice was issued.  ECF No. 35. On October

29, 2018, Plaintiff filed a response in opposition.  ECF Nos. 38.  By Order entered October 30,

---

[2] The medical records date from as early December 4, 2010 through September 21, 2018.  See ECF No. 33-1 through 33-16.

2018, the Clerk was directed to correct the names of several of the defendants on the docket. ECF No. 40. By separate Order entered the same day, the Plaintiff's unsigned Amended Complaint was noted and he was directed to refile a signed copy of the same. ECF No. 41. On November 21, 2018, without leave of Court, Plaintiff filed another response in opposition to the Defendants' dispositive motion, along with a signed copy of the Amended Complaint. ECF Nos. 43, 45.

By Miscellaneous Case Order entered November 30, 2018, this case was reassigned from Senior District Judge Irene M. Keeley to District Judge Thomas S. Kleeh. ECF No. 46.

On January 16, 2019, Plaintiff filed a motion to attach an addendum. ECF No. 49. By Order entered April 11, 2019, Plaintiff's motion to file an addendum was construed as a motion to file a surreply and denied. ECF No. 53. On June 11, 2019, Plaintiff's second motion for appointed counsel was denied. ECF No. 58.

Accordingly, the case is before the undersigned for an initial review and report and recommendation pursuant to LR PL P 2.

## II. <u>Contentions of the Parties</u>

### A. <u>The Amended Complaint</u>

In the signed copy of his amended complaint, Plaintiff names individual ERJ Prime Care Medical staff members by name and raises claims of Eighth Amendment violations arising out of deliberate indifference to his serious medical, vision, and dental needs; conspiracy; and forgery of his name and health information on medical documents and on the jail's kiosk system for filing grievances. Plaintiff also raises a claim of "insurance fraud." ECF No. 45.

More specifically, Plaintiff alleges that after he arrived at the ERJ in December, 2017, the Defendants acted in concert and conspired to deny him treatment, and refused to send him for his follow up testing and treatment for his testicular cancer and falsified records related to this. He

contends that as a result of the failure to send him for follow up treatment and/or testing at the cancer center in Huntington, West Virginia, where he was previously treated, at least two months before he filed his complaint, a new testicular tumor was found, for which he has still received no treatment. He avers that the defendants also refuse him treatment for his vision problems and his impacted wisdom teeth.   Plaintiff contends that in addition to denying medical and dental treatment, the defendants have forged documents to show that he was seen in medical when he was not, and that they have submitted false claims to his West Virginia Medical Card for medical services that he never received, thereby committing "insurance fraud." Id. at 1 – 17.

Plaintiff contends that as a result of Defendants' wrongful actions, he has been denied treatment for testicular cancer, his vision, and dental services; has experienced pain and suffering; has sustained unspecified damage to his eyes, and has developed a new, life-threatening testicular tumor.  Id. at 7, 17.

Plaintiff contends he has exhausted his administrative remedies with regard to these claims but got no response on any of his grievances.  Id. at 12 - 13.

As relief, Plaintiff seeks unspecified compensatory and punitive damages.[3] Id. at 17.

## B. Defendants' Motion to Dismiss and Alternative Motion for Summary Judgment

Defendants contend that the case should be dismissed or summary judgment granted in their favor, because

1) Plaintiff has not complied with the West Virginia Medical Professional Liability Act ("MPLA") by filing a pre-suit notice of claim and screening certificate of merit;

2) Prime Care Medical of West Virginia, Inc. is not a "person" subject to suit under § 1983;

---

[3] Despite having been specifically advised in the August 23, 2018 Order and Notice that in filing an Amended Complaint, he could not simply refer to the original complaint or incorporate the same by reference, and that the Amended Complaint would supersede all others and be the only complaint given review [ECF No. 12 at 4], nonetheless, Plaintiff states "[p]lease refer to original paperwork filled [sic][.] Im [sic] going to lose a testicle I want money damages, surgery, price of a testicle, pain & suffering[,] [and] punitive damages." ECF No. 48 at 17.

3) Plaintiff's claims do not state a viable Eighth Amendment claim, because his medical records show that he repeatedly refused the medical care and treatment that was offered;

4) Plaintiff's vague allegations of insurance fraud, medical records fraud, and conspiracy to forge medical records should be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) and Bell Atlantic v. Twombly.[4]

ECF No. 32 at 1 – 2; ECF No. 33 at 9 - 15. In further support, Defendants attach excerpts from Plaintiff's medical records to their memorandum.  See ECF No. 33-1 through 33-16.

## C. Plaintiff's Responses in Opposition

Plaintiff's October 29, 2018 response contends that his case should not be dismissed because all the documents Defendants attached to their motion are "forged" and the medical treatment refusal forms Defendants produced have his signature forged on them. ECF No. 38 at 1. He vehemently denies ever having refused treatment and insists that Defendants are merely alleging this and forging documents to discredit him. Id.  Further, he asks how an inmate fighting cancer is expected to know to file a complaint under the MPLA. Id. Plaintiff insists that Defendants only included one out of "40 or 50" of his requests for medical care to support their lies, and that they have lied to their lawyers. Id. at 1 – 2.

Plaintiff alleges that since being transferred from ERJ, he is now receiving treatment for his wisdom teeth, has never been refused any treatment or been denied care, and arrangements are being made for him to see his cancer doctors. ECF No. 38-4 at 1.  He argues that further proof that his allegations are true is that Prime Care at ERJ never mentioned anything to Martinsburg Correctional Center ("MCC") about his new tumor. Id. He alleges that he never received responses to the grievances he filed on ERJ's kiosks and several messages on the kiosk were never opened. Id.  He contends that not one person on the medical staff at MCC has yelled at him or told him they would not schedule appointments for him, like Defendant Skidmore did at ERJ. Id. at 2. He

---

[4] Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct.1955, 167 L.Ed.2d 929 (2007).

avers that MCC medical staff was "outraged" at the care he received from Prime Care at ERJ, and MCC medical staff confirmed that he has a palpable testicular tumor. Id. He reiterates his allegations regarding the deficiencies in the kiosk grievance system [id. at 3], and indicates his willingness to settle his claims with defendants. Id. at 5. He also avers that he has witnesses, correctional officers who heard Defendant Skidmore tell him to sue her because she would not schedule appointments for him. Id. He attaches several pages of his medical records on which he has drawn arrows and/or written various notes in the margins, such as "false," "okay," and "lie" next to notations in the records. ECF No. 38-2 at 1, 3 – 4.

Plaintiff's second Roseboro response, filed without leave of Court on November 21, 2018, insists that any exhibits produced by Defendants containing his signature should be subjected to handwriting analysis to prove they are forged; accordingly, he requests that a handwriting expert be appointed.   ECF No. 43. However, under the local rules of this District, surreply and surrebuttal memoranda may not be filed; therefore, Plaintiff's additional response will not be considered by the undersigned. LR PL P 11(d).

### III. <u>Standard of Review</u>

#### A. <u>Motion to Dismiss</u>

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a case when a complaint fails to state a claim upon which relief can be granted. Dismissal under Rule 12(b)(6) is inappropriate unless it appears beyond doubt that the plaintiff cannot prove any set of facts to support his or her allegations. <u>Revene v. Charles County Comm'rs</u>, 882 F.2d 870 (4th Cir. 1989). Courts, however, are not required to accept conclusory allegations couched as facts and nothing more when ruling on a motion to dismiss pursuant to 12(b)(6). A complaint must include "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not

do . . . " Bell Atlantic Corp. v. Twombly, 550 U.S. at 555. "Factual allegations must be enough to raise a right to relief above the speculative level." Id.

To survive a motion to dismiss, a plaintiff must state a plausible claim in his complaint that is based on cognizant legal authority and includes more than conclusory or speculative factual allegations. "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" because courts are not bound to accept as true a legal conclusion couched as a factual allegation. Id.; see also Nemet Chevrolet, Ltd. v. Comsumeraffairs.com, Inc., 591 F.3d 250 (4th Cir. 2009). "[D]etermining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense." Id.

Whether a complaint is legally sufficient is measured by whether it meets the standards for a pleading stated in the Federal Rules of Civil Procedure. See Fed.R.Civ. P 8 (providing general rules of pleading), Fed.R.Civ. P. 9 (providing rules for pleading special matters), Fed.R.Civ. P. 10 (specifying pleading form), Fed.R.Civ. P. 11 (requiring the signing of a pleading and stating its significance), and Fed.R.Civ. P. 12(b)(6) (requiring that a complaint state a claim upon which relief can be granted.) Francis v. Giacomelli, 588 F.3d 186 (4th Cir. 2009).

Shy is representing himself, which requires the Court to liberally construe his pleadings. Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251(1976); Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)(per curiam); Loe v. Armistead, 582 F.2d 1291 (4th Cir. 1978); Gordon v. Leeke, 574 F.2d 1147 (4th Cir. 1978). While *pro se* pleadings are held to a less stringent standard than those drafted by attorneys, Haines, 404 U.S. at 520, even under this less stringent standard, a *pro se* complaint is still subject to dismissal. Id. at 520-21. The mandated

7

liberal construction means only that if the Court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so. Barnett v. Hargett, 174 F.3d 1128 (10th Cir. 1999). A court may not construct the plaintiff's legal arguments for her. Small v. Endicott, 998 F.2d 411 (7th Cir. 1993). Nor should a court "conjure up questions never squarely presented." Beaudett v. City of Hampton, 775 F.2d 1274 (4th Cir. 1985).

## B. Motion for Summary Judgment

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In Celotex, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. Celotex, 477 U.S. at 323. Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita, 475 U.S. at 586. The nonmoving party must present specific facts showing the existence of a genuine issue for trial. Id. This means that the party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.' Anderson, 477 U.S. at 256. The "mere existence of a scintilla of evidence" favoring the nonmoving

party will not prevent the entry of summary judgment. Id. at 248. Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita, 475 U.S. at 587.

## IV. <u>Analysis</u>

### A. <u>Deliberate Indifference to Serious Medical Needs</u>

To state a claim under the Eighth Amendment for ineffective medical assistance, the plaintiff must show that the defendant acted with deliberate indifference to his serious medical needs. Estelle v. Gamble, 429 U.S. 97, 104 (1976). To succeed on an Eighth Amendment cruel and unusual punishment claim, a prisoner must prove: (1) that objectively the deprivation of a basic human need was "sufficiently serious," and (2) that subjectively the prison official acted with a "sufficiently culpable state of mind." Wilson v. Seiter, 501 U.S. 294, 298 (1991). Therefore, "the Eighth Amendment does not apply to every deprivation, or even every unnecessary deprivation suffered by a prisoner, but *only* that narrow class of deprivations involving 'serious' injury inflicted by prison officials acting with a culpable state of mind." Hudson v. McMillan, 503 U.S. 1, 20 (1970) (emphasis original).

A serious medical condition is one that has been diagnosed by a physician as mandating treatment or that is so obvious that even a lay person would recognize the need for a doctor's attention. Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1st Cir. 1990), *cert. denied*, 500 U.S. 956 (1991). A medical condition is also serious if a delay in treatment causes a life-long handicap or permanent loss. Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3rd Cir. 1987), *cert. denied*, 486 U.S. 1006 (1988).[5]

---

[5] The following are examples of what does or does not constitute a serious injury. Testicular cancer is a serious medical need. Neihaus v. GEO Group, Inc., No. 3:13-cv-992, 2015 U.S. Dist. LEXIS 39481, *11, 14, Anderson, L.R. (S.D. Miss. Mar. 27, 2015). A torn rotator cuff is a serious injury. Fishback v. Depuy Orthopaedics, 2013 U.S. Dist. LEXIS 35562, * 28, 2013 WL 1010386 (D. Md. 2013); see also Oliver v. Pa Dep't of Corr., 2014 U.S. Dist. LEXIS 2368,

The subjective component of a cruel and unusual punishment claim is satisfied by showing that the prison official acted with deliberate indifference.  Wilson, 501 U.S. at 303.  A finding of deliberate indifference requires more than a showing of negligence. Farmer v. Brennan, 511 U.S. 825, 835 (1994). A prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. A prison official is not liable if he "knew the underlying facts but believed (albeit unsoundly) that the risk to which the fact gave rise was insubstantial or nonexistent." Id. at 844.

"To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment, [or lack thereof], must be so grossly incompetent, inadequate,

---

*17-18, 2014 WL 80725 (E.D. Pa. 2014); Kostyo v. Harvey, No. 09-2509, 2010 U.S. Dist. LEXIS 93384, 2010 WL 3522449, at *8 (N.D. Ohio Sept. 8, 2010) ("Severe shoulder pain, including a possible rotator cuff tear, may qualify as a serious medical need."). A foot condition involving a fracture fragment, bone cyst and degenerative arthritis is not sufficiently serious. Veloz v. New York, 35 F.Supp.2d 305, 312 (S.D.N.Y. 1999). Conversely, a broken jaw is a serious medical condition. Brice v. Virginia Beach Correctional  Center, 58 F. 3d 101 (4th Cir. 1995); a detached retina is a serious medical condition. Browning v. Snead, 886 F. Supp. 547 (S.D. W. Va. 1995). Arthritis is a serious medical condition because the condition causes chronic pain and affects the prisoner's daily activities. Finley v. Trent, 955 F. Supp. 642 (N.D. W.Va. 1997). A pituitary tumor is a serious medical condition. Johnson v. Quinones, 145 F.3d 164 (4th Cir. 1998). A plate attached to the ankle, causing excruciating pain and difficulty walking and requiring surgery to correct it is a serious medical condition.  Clinkscales v. Pamlico Correctional Facility Med. Dep't., 2000 U.S. App. LEXIS 29565 (4th Cir. 2000). A tooth cavity can be a serious medical condition, not because cavities are always painful or otherwise dangerous, but because a cavity that is not treated will probably become so. Harrison v. Barkley, 219 F.3d 132, 137 (2nd Cir. 2000). A prisoner's unresolved dental condition, which caused him great pain, difficulty in eating, and deterioration of the health of his other teeth, was held to be sufficiently serious to meet the Estelle standard. Chance v. Armstrong, 143 F.3d 698, 702 - 703 (2nd Cir. 1998). A degenerative hip a serious condition. Hathaway v. Coughlin, 37 F.3d 63, 67 (2d Cir. 1994). Under the proper circumstances, a ventral hernia might be recognized as serious. Webb v. Hamidullah, 281 Fed. Appx. 159 (4th Cir. 2008). A twenty-two hour delay in providing treatment for inmate's broken arm was a serious medical need. Loe v. Armistead, 582 F.2d 1291, 1296 (4th Cir. 1978). A ten-month delay in providing prescribed medical shoes to treat severe and degenerative foot pain causing difficulty walking is a serious medical need. Giambalvo v. Sommer, 2012 WL 4471532 at *5 (S.D.N.Y. Sep. 19, 2012). Numerous courts have found objectively serious injury in cases involving injury to the hand, including broken bones. See, e.g., Lepper v. Nguyen, 368 F. App'x. 35, 39 (11th Cir. 2010); Andrews v. Hanks, 50 Fed. Appx. 766, 769 (7th Cir. 2002); Bryan v. Endell, 141 F.3d 1290, 1291 (8th Cir. 1998); Beaman v. Unger, 838 F.Supp.2d 108, 110 (W.D. N.Y. 2011); Thompson v. Shutt, 2010 WL 4366107 at *4 (E.D. Cal. Oct. 27, 2010); Mantigal v. Cate, 2010 WL 3365735 at *6 (C.D. Cal. May 24, 2010) report and recommendation adopted, 2010 WL 3365383 (C.D. Cal. Aug. 24, 2010); Johnson v. Adams, 2010 WL 1407787 at *4 (E.D. Ark. Mar. 8, 2010) report and recommendation adopted, 2010 WL 1407790 (E.D. Ark. Mar. 31, 2010); Bragg v. Tyler, 2007 WL 2915098 at *5 (D.N.J. Oct. 4, 2007); Vining v. Department of Correction, 2013 U.S. Dist. LEXIS 136195 at *13 (S.D.N.Y. 2013)(chronic pain arising from serious hand injuries satisfies the objective prong of Eighth Amendment deliberate indifference analysis). A three-day delay in providing medical treatment for an inmate's broken hand was a serious medical need. Cokely v. Townley, 1991 U.S. App. LEXIS 1931 (4th Cir. 1991).

or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990). A mere disagreement between the inmate and the prison's medical staff as to the inmate's diagnosis or course of treatment does not support a claim of cruel and unusual punishment unless exceptional circumstances exist. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). A constitutional violation is established when "government officials show deliberate indifference to those medical needs which have been diagnosed as mandating treatment, conditions which obviously require medical attention, conditions which significantly affect an individual's daily life activities, or conditions which cause pain, discomfort or a threat to good health." See Morales Feliciano v. Calderon Serra, 300 F.Supp.2d 321, 341 (D.P.R. 2004) (citing Brock v. Wright, 315 F.3d 158, 162 (2nd Cir. 2003)).

**1) Testicular Cancer Treatment**

Plaintiff alleges that he has a history of testicular cancer, for which he was treated at the Edwards Comprehensive Cancer Center ("ECCC") in Huntington, West Virginia, and that as a result of the Defendants' denial of treatment while he was at ERJ, he suffered a recurrence and developed a new testicular tumor. He contends that even after the new tumor was found, Defendants continued to refuse him treatment.

A review of the medical records provided by the Defendants reveals that after an unspecified delay, Plaintiff initially sought treatment in December, 2014 after discovering a 2 cm. hard, nontender mass in his right testicle.  ECF No. 33-3 at 1. An ultrasound of the scrotum showed two masses, one 22x19x16 mm, and one 3 mm in diameter; findings "[v]ery concerning for malignancy." Id. He was seen by urology and in December, 2014, underwent a right radical orchiectomy (removal of testicle) [id. at 5]; the pathological exam indicated that the tumor was a

seminoma.[6] Id. at 1. His LDH/AFB [sic]/HCG[7] were within normal limits at the time of surgery, and he received two cycles of chemotherapy, finishing in May, 2015. Id. at 1, 5. In January, 2016 follow up, his tumor markers were normal. Id. A February 2016 CT scan showed "NED" (no evidence of disease). Id.

A CT scan of the chest with contrast, performed on February 20, 2017 for testicular cancer restaging, found no acute abnormality or evidence of metastatic disease. Id. at 4. A CT of the abdomen and pelvis with contrast, performed the same day for the same reason, found no enlarged lymph nodes or suspicious bone lesions. Id. at 5.

Plaintiff was seen by an oncologist the next day, February 21, 2017 in follow up for a chief complaint of Stage 1 seminoma testicular cancer. Id. He was 25 years old, overweight (5'9" and 255#), and other than some issues with urinary retention, for which he self-catheterized, and fatigue, his exam was normal. Id. at 1, 5. He was to return in six months. Id. at 5.

On December 13, 2017, while incarcerated at the Western Regional Jail ("WRJ") in Barboursville, West Virginia, Plaintiff refused to go to his regular follow-up visit at the ECCC because his wife was planning to visit. See ECF No. 33-1 at 1. The nurse counseled him on the importance of keeping his oncology follow up visits. Id.

---

[6] There are multiple kinds of testicular tumors, but Plaintiff's tumor, a seminoma, is a type that tends to grow and spread more slowly than non-seminomas. See What is Testicular Cancer, *available at*: < https://www.cancer.org/cancer/testicular-cancer/about/what-is-testicular-cancer.html >

[7] The undersigned presumes that the "AFB" is a typographical error by the transcriptionist who likely misheard the dictating physician's reference to "AFP" in his dictated note.
    LDH/AFP/HCG are "tumor markers," or certain proteins in the blood that are diagnostic in typing and assessing the spread of testicular tumors, which produce high levels of these proteins, such as alpha-fetoprotein (AFP) and human chorionic gonadotropin (HCG). When these tumor markers are present, it is indicative of testicular tumor. Rises in levels of AFP or HCG can also indicate which type of testicular cancer it might be. A testicular tumor might also increase the levels of an enzyme called lactate dehydrogenase (LDH). A high LDH level often (but not always) indicates widespread disease; however, LDH levels can also be increased with some non-cancerous conditions. Tumor marker tests sometimes are also used in staging cancer (estimating how much cancer is present), assessing the efficacy of treatment, or when looking for signs of cancer recurrence. See Tests for Testicular Cancer, *available at* < https://www.cancer.org/cancer/testicular-cancer/detection-diagnosis-staging/how-diagnosed.html >

Plaintiff arrived at the ERJ on December 21, 2017. See ECF No. 33 at 10; ECF No. 33-1 at 1; ECF No. 33-2.  He reported that he had previously been treated at the ECCC and needed to be seen by a local oncologist to get a CT scan, because he missed his last visit with his Huntington oncologist. See ECF No. 33-2.

On January 3, 2018, a request was sent to the ECCC for a copy of Plaintiff's oncology records. See ECF No. 33-1.  Those records confirmed that Shy's labs for tumor markers in January, 2016 were normal and his CT scan in February, 2017 showed NED. It was recommended that his labs be done every six months and that a CT scan be performed annually. See ECF No. 33-3 at 5. Shy was then scheduled to see Prime Care's Nurse Practitioner ("N.P."), Tamara Kessel, to be examined and scheduled for the recommended labs and CT scan. He refused to see N.P. Kessel on January 9, January 22, and February 12, 2018. See ECF No. 33-5. He signed a "Refusal to Consent to Treatment" for the January 22 and February 22, 2018 appointments, saying he did not want to go. See ECF No. 33-4 at 1; ECF No. 33-4 at 2. Finally, he agreed to see N.P. Kessel on February 19, 2018. ECF No. 33-5. She examined him and encouraged compliance with treatment and the need for him to have lab tests and the CT scan; he finally agreed to the treatment. Id. Shy's lab tests were scheduled for February 23, 2018. The final report was issued on March 5, 2018, showing his tumor marker assay was normal. See ECF No. 33-6 at 2.

Defendants aver that on March 23, 2016 [sic], an appointment was scheduled for Shy to have a CT scan with contrast on April 10, 2018.[8] See ECF No. 33 at 11.

---

[8] However, the medical record Defendants reference in support of this claim [ECF No. 33-7] does not show either the date the CT scan was scheduled or the date the appointment was made; nonetheless, a different page in the records does confirm that N.P. Kessel did create the appointment on March 23, 2018, scheduling the CT scan for April 10, 2018. See ECF No. 33-8 at 2.

On April 9, 2018, Shy signed a Refusal to Consent to Treatment for his scheduled April 10, 2018 CT scan, stating he "**was told by attorney** [name illegible] **not to attend visit**." See ECF No. 33-8 at 1 (emphasis added).

On April 16, 2018, another consult for a CT scan was scheduled for June 11, 2018. See ECF No. 33-9. Again, Shy refused the appointment. See June 11, 2018 "Refusal to Consent to Treatment," signed by Shy, ECF No. 33-10. Shy's reason for the refusal is illegible. Id.

On July 2, 2018, Shy complained of a BB-sized lump, now in his left testicle, and was seen by NP Kessel. ECF No. 33-11. He admitted having refused to attend his scheduled April 2018 CT scan appointment, saying he had done so as a "rebellion," because Kessel had refused to clear him to work as a trustee. Id. NP Kessel again ordered lab tests, a CT scan and an ultrasound of his testicle. Id.

However, on July 12, 2018, without providing a reason, Shy signed another Refusal to Consent to Treatment, refusing to have the scheduled lab work done. See ECF No. 33-12.

On July 23, 2018, Shy signed another Refusal to Consent to Treatment, refusing to have the scheduled outside consult/ultrasound of his testicle because he was "not happy" about being shackled and cuffed and having to wait to go to the appointment. See ECF No. 33-13 at 1 - 2. Defendant Skidmore explained that medical had no control over that, noting that he had already cancelled several scheduled appointments. Id. However, Plaintiff was adamant and could not be persuaded to go. Id.

On August 14, 2018, five days after filing suit, Plaintiff filed an inquiry at ERJ, requesting the names of ERJ medical staff, and declaring that the only medical treatment he would accept would be an appointment at ECCC in Huntington, a six-hour drive from the ERJ. See ECF No. 33-14.  In that note, Plaintiff stated in pertinent part that:

> **I have refused my appointments all of them and will continued to refuse them until the medical staff take the proper actions with my cancer which is scheduling me a appointment with my cancer [doctor] at the edwards cancer center** at cabell huntington hospital which now for 8 months no one has done and your medical nuseres made the comment I'm not scheduling any appointments for you from now on which is a direct violation to my rights denial of medical care so the purpose is for you guys to schedule the right appointment instead of what your doctor thinks is right she is not a cancer doctor so how can she order ct scan and blood work for a cancer patient she cannot that's why I see a cancer doctor in huntington and because you guys  have failed at that task for 8 months your doctor found a tumor on my testicle and I know this because the medical staff at western reginal did what they were supposed to do they told me no matter what you have to take me to mycancer doctor in **huntinton so until then im refusing all appointments** I never signed my name to anything refusing any appointments of if soebody signed my name on saturday for my eye glass screen then it was forged no officer brought me paper work to refuse anything nor was I informed I had a eye glass screen

ECF No. 33-14 (emphasis added) (all spelling, punctuation, and grammatical errors in original).

## a) <u>Defendant Tamera Kessel, Nurse Practitioner</u>

Plaintiff alleges that during the eight months before he filed suit, Kessel repeatedly refused to send him to his doctors at the ECCC in Huntington, despite his repeated requests (since December 2017) that he be permitted to see them. He contends that two months before he filed his complaint, Kessel confirmed what Plaintiff had already discovered, that Plaintiff had a new tumor on his left[9] testicle, but despite that, Kessel still continued to deny him treatment. ECF No. 45 at 14 - 15. Plaintiff further avers that he told "**the doctor or nurse that he will not go to any appointments that they schedule that are unnecessary" and that he has "repeatedly told this doctor that I will not go to any appointment unless they are to my cancer doctor . . . [but] she still took it upon herself to schedule.**" <u>Id.</u> at 3  (emphasis added).

---

[9] Elsewhere in the complaint, Plaintiff alleges the new tumor was found on "his right, his only testicle[.]" ECF No. 45 at 3.

Defendants contend that to the contrary, they were not deliberately indifferent to Plaintiff's serious medical need, because Plaintiff's medical records show that he was scheduled for lab work and CT scans numerous times, and repeatedly refused to go to the hospital for these tests.

The undersigned agrees.  Even though Plaintiff's testicular cancer certainly constitutes a serious medical need, thus satisfying the objective element, the medical records establish that Plaintiff received or was repeatedly offered and scheduled for frequent, appropriate, and more than adequate care. Therefore, Plaintiff cannot satisfy the subjective element, and he fails to establish an Eighth Amendment violation. Merely because he disagreed with the ERJ's medical staff as to the location where he was to receive his course of treatment, or referral to the physician(s) of his choice, does not support a claim of cruel and unusual punishment unless exceptional circumstances exist. The ERJ staff was more than capable of monitoring Plaintiff's condition by providing the necessary follow up and testing, and would have referred him for appropriate oncology services as needed. Plaintiff's contention that ERJ's refusal to treat him caused his recurrent testicular tumor has no support in the record; Plaintiff discovered the BB-sized lump in his testicle July 2, 2018, after he had already been refusing the recommended follow up monitoring for months, because ERJ staff could or would not transport him six hours away to ECCC.  Even after discovering the new testicular lump, the medical records support Defendants' contention that Plaintiff continued to refuse oncological monitoring for the approximately two and a half more months he remained at ERJ. Further, Plaintiff's own complaint openly admits that he repeatedly refused care and testing because he was not being referred to the locale of his choice. There is not the slightest suggestion in the record that N.P. Kessel was deliberately indifferent to Plaintiff's medical needs.

It is well settled law that disagreements between a health care provider and an inmate over a diagnosis and the proper course of treatment are not sufficient to support a deliberate indifference claim, and questions of medical judgment are not subject to judicial review. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985); Russell v. Sheffer, 528 F.2d 318, 319 (4th Cir. 1975). Moreover, an inmate is not entitled to unqualified access to health care and treatment may be limited to what is medically necessary and not "that which may be considered merely desirable" to the inmate. Bowring v. Godwin, 551 F.2d 44, 47-48 (4th Cir. 1977). Accordingly, Plaintiff's claim against Kessel fails to state a claim upon which relief can be granted.

### b) Defendant Rhonda Skidmore, RN

Plaintiff contends that Defendant Skidmore "made [a] direct verbal statement to . . . [his] face" in an aggressive manner "I will not schedule any of your appointments, at all." ECF No. 45 at 16. He further contends that Skidmore yelled at him in front of others, saying she would refuse him all medical care "because I can, [so] sue me." Id. Further, he alleges she forged her computer system to indicate that he was seen, in order to refuse him. Id. Again, he contends that on the kiosk, it says he refused appointments, but he denies this. Id.

In response, the Defendants deny Skidmore was deliberately indifferent to Plaintiff's serious medical needs, noting that Plaintiff's medical records show that he was repeatedly scheduled for lab work and CT scans, and repeatedly refused to go to the hospital for these tests. The undersigned agrees. Again, although testicular cancer is a serious medical need, thus satisfying the objective element, the medical records establish that Plaintiff received or was repeatedly offered and scheduled for frequent, appropriate, and more than adequate care. Therefore, Plaintiff cannot satisfy the subjective element, and he fails to establish an Eighth Amendment violation.

Plaintiff also claims that Defendant Skidmore yelled at him and displayed hostility toward him during office visits. ECF No. 45 at 16. However, verbal harassment and threats do not constitute violations of the Eighth Amendment. Wagner v. Wheeler, 13 F.3d 86, 92-93 (4th Cir. 1993) (verbal abuse does not amount to a constitutional violation); McBride v. Deer, 240 F.3d 1287, 1291 n. 3 (10th Cir. 2001) (taunts and threats are not an Eighth Amendment violation); Eury v. Angelone, No. 01-cv-257, 2001 WL 24042606, at *4 (E.D. Va. June 11, 2001) (alleged derogatory racial remarks, even if true, are not constitutional violations); see also Keenan v. Hall, 83 F.3d 1083, 1092 (9th Cir. 1996); Oltarzewski v. Ruggiero, 830 F.2d 136, 138 (9th Cir. 1987); Gaut v. Sunn, 810 F.2d 923, 925 (9th Cir. 1987). Emmons v. McLaughlin, 874 F.2d 351, 354 (6th Cir. 1989) (verbal threats causing fear for plaintiff's life not an infringement of a constitutional right); Martin v. Sargent, 780 F.2d 1334, 1338 (8th Cir. 1985) (calling an inmate an obscene name did not violate constitutional rights); Lamar v. Steele, 698 F.2d 1286 (5th Cir. 1983) ("Threats alone are not enough; a § 1983 claim only accrues when the threats or threatening conduct result in a constitutional deprivation."); Ellingburg v. Lucas, 518 F.2d 1196, 1197 (8th Cir. 1975) (defamation does not implicate any constitutionally protected right); Keyes v. City of Albany, 594 F. Supp. 1147 (N. D. N.Y. 1984) ("[T]he use of vile and abusive language [including racial] epithets], no matter how abhorrent or reprehensible, cannot form the basis for a 1983 claim.").

Accordingly, even if Defendant Skidmore were rude, hostile, and unprofessional toward Plaintiff, which appears doubtful from the record, this does not rise to the level of deliberate indifference, see Mitchell v. Justus, No. 7:06cv318, 2006 U.S. Dist. LEXIS 36656, *3, *5, 2006 WL 1587459 (W.D. Va. June 6, 2006) (a nurse's choice of words may be unprofessional and inappropriate, but verbal abuse and harassment by correctional employees, without more, does not

18

state a constitutional claim); <u>Acuna v. Ikegbu</u>, No. 14-CV-03651-JCS (PR), 2014 U.S. Dist. LEXIS 173089, 2014 WL 7183702, at *3 (N.D. Cal. Dec. 15, 2014) (yelling at a patient may be rude but does not show deliberate indifference). This claim fails to state a claim upon which relief can be granted and should be dismissed.

**2) <u>Denial of Dental Care – Defendant Jennifer Bennett, Medical Assistant</u>**

Plaintiff also alleges the ERJ Prime Care staff were deliberately indifferent to his dental needs. Specifically, Plaintiff alleges that Defendant Jennifer Bennett failed to take him to an oral surgeon to remove his compacted wisdom teeth on two occasions. ECF No. 45 at 4.

However, Plaintiff's records reveal that he was seen by dentist Jack Chambers for pain in "tooth 17"[10] on May 31, 2018 and was told he needed an evaluation by an oral surgeon. ECF No. 33-16 at 1. He was prescribed amoxicillin for a possible extraction of the tooth. <u>Id.</u> On June 1, 2018, Bennett scheduled him an appointment on September 27, 2018 with an oral surgeon. <u>Id.</u> at 2; <u>see</u> <u>also</u> <u>id.</u> at 2. Plaintiff was seen again by Dr. Chambers on July 12, 2018 for continued pain in the same tooth and was prescribed more amoxicillin and Motrin for the pain. <u>Id.</u> at 1. Although he had the appointment with the oral surgeon scheduled for September 27, 2018, he was transferred to MCC a week earlier; Prime Care does not provide the medical/dental care at MCC. <u>Id.</u> at 2.

Untreated, painful dental conditions are a serious medical need, thus satisfying the objective component. Plaintiff's dental records establish that he received or was scheduled for appropriate and adequate care whenever he presented with a problem. There is simply no support in the record for Plaintiff's claim that Defendant Bennett twice failed to take him to an oral surgeon to remove his compacted wisdom teeth. To the contrary, it is apparent that Bennet made him an oral surgery appointment to address the impacted tooth after he first complained of the pain, but

---

[10] "Tooth 17" is a wisdom tooth. <u>See</u> Tooth Numbers and Illustrations, *available at*: < https://dentalimplants-usa.com/bone-and-teeth/tooth-numbering/ >

Plaintiff was transferred from the ERJ before he could attend it. Therefore, Plaintiff cannot satisfy the subjective element, and he fails to establish an Eighth Amendment violation.

### a) Defendants Jennifer Bennett  and Christina Stillwell, Medical Assistants

Plaintiff also alleges that Jennifer Bennett forged unspecified health information in his medical records and information on the kiosk system, to make it seem as though she was doing her job, when she was actually denying him care. ECF No. 45 at 4. He avers that she "takes orders from Rhonda [Skidmore]." Id.  He further alleges that Christina Stillwell forged his unspecified sick calls by claiming he was seen for a medical issue that he was never seen for. Id.

Again, as noted *supra*, there is no support in the record for Plaintiff's claims that he was denied medical, vision, or dental care by any ERJ medical staff person.[11]  Thus, these vague claims against Defendants Bennett and Stillwell are merely insufficiently pled conclusory allegations without factual support, and are insufficient to raise a right to relief beyond the speculative level. Bell Atlantic Corp. v. Twombly, 550 U.S. at 555. They fail to state a claim upon which relief can be granted.

### 3) Denial of Vision Treatment

---

[11] The records also reveal that on November 29, 2017, before Plaintiff arrived at EJR, an LPN at another prison noted that:

> Inmate was in the hall during an attorney visit and ask [sic] this nurse what she needed him for this morning when she requested his presence during medication pass. This nurse explained to Inmate that the psychiatrist had requested this nurse inform Inmate that his Zoloft [antidepressant] will be discontinued due to non compliance [sic] if he does not take it and he cannot receive Trazadone [sic] [antidepressant] due to this medication being used to treat sleep. Inmate states that he is not taking the Zoloft without the Trazadone [sic] due to taking this combination for PTSD. **Inmate states that his attorney has advised him to not take the Zoloft so it would look worse on the jail if he isn't getting his medications** . . .

ECF No. 33-1 (emphasis added).

Plaintiff complains that Defendants were deliberately indifferent to his vision problems, because they failed to provide him with eyeglasses while he was at the ERJ.  Plaintiff does not specify which Defendants denied him vision care or what the problem with his eyes was.

However, the records Defendants produced show that on three occasions (June 23, 2018, July 29, 2018, and August 11, 2018), Plaintiff refused to the Snellen eye examinations[12] required to determine visual acuity, necessary to determine the prescription for eyeglasses. See ECF No. 33-15 at 1 – 3.  After the third refusal, the records indicate that Plaintiff "[w]ill not be scheduled for another one." Id. at 3.

Plaintiff does not specify what his particular vision problem was, so it is unknown whether he can satisfy the objective component, proving a serious medical need. However, given that Plaintiff's medical records establish that he was repeatedly scheduled for the eye exams required to obtain an updated prescription for eye glasses and refused to go, it seems likely that Plaintiff's vision problems were not sufficiently serious to cause a lifelong handicap or permanent loss, despite his allegations to the contrary. Therefore, even if his unspecified vision problem were a serious medical need, Plaintiff cannot satisfy the subjective element, and thus, he fails to establish an Eighth Amendment violation. This claim likewise fails to state a claim upon which relief can be granted.

**B. Conspiracy**

Plaintiff alleges that when he arrived at ERJ in December 2017, the defendants acted in concert and conspired to deny him treatment, refusing to send him for follow up testing and treatment for his testicular cancer, and conspired to falsify records related to this. ECF No. 45 at

---

[12] The Snellen eye examination is the standard chart used by eye doctors showing 11 rows of capital letters in decreasing size, used to test visual acuity.

4. In response, the Defendants contend that these are conclusory allegations without support in the record.

      To establish a civil conspiracy, a plaintiff must prove that two or more persons acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in the plaintiff's deprivation of a constitutional right.  Hinkle v. City of Clarksburg, WV, 81 F.3d 416 (4th Cir. 1996).   Moreover, the plaintiff has a "weighty burden to establish a civil rights conspiracy." Id. at 421.  While the plaintiff does not need to "produce direct evidence of a meeting of the minds, [he] must come forward with specific circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective." Id.  The plaintiff must produce evidence that at least leads to the inference that the defendants had a mutual agreement to conspire against him, "mere speculation and conjecture will not suffice." Puglise v. Cobb County, 4 F.Supp.2d 1172, 1181 (N.D. Ga. 1998).

      Here, it appears that the Plaintiff's claim is that the goal of the defendants' alleged conspiracy was to prevent Plaintiff from receiving treatment from his chosen oncologist for his testicular cancer. However, it has already been shown, *supra,* that Plaintiff's complaint also freely admits that he told "the doctor or nurse that he will not go to any appointments that they schedule that are unnecessary" and that he "repeatedly told this doctor that I will not go to any appointment unless they are to my cancer doctor . . . [but] she still took it upon herself  to schedule." ECF No. 45 at 3. Thus, Plaintiff cannot show that any defendant could have conspired for such a purpose.

      Therefore, even viewing all of the facts in the light most favorable to the Plaintiff, he has failed to establish that two or more persons carried out a preconceived plan or common design.  In fact, he provides no evidence which would lead to even an inference that the Defendants had an agreement to conspire against him.  This claim, as well, fails to state a claim upon which relief can

be granted against any Defendant.  Because the record shows that there is no genuine issue as to any material fact, the Defendants are entitled to judgment as a matter of law.

**C. Forgery of Plaintiff's Name and Health Information**

Plaintiff contends that the Defendants forged documents to show that he was seen in medical when he was not. ECF No. 45 at 4.  He also contends that the signatures in his medical records on the treatment refusals are forged, to make it appear that he refused treatment when he did not.

As a preliminary point, the record is replete with Plaintiff's admissions to refusing treatment. Moreover, there is no support in the record to show that the medical records produced by the Defendants were "forged." Courts are not required to accept conclusory allegations couched as facts and nothing more when ruling on a motion to dismiss pursuant to 12(b)(6), and a complaint must include "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . " Bell Atlantic Corp. v. Twombly, 550 U.S. at 555. Here, Plaintiff's factual allegations are insufficient to raise a right to relief above the speculative level. Id.

Further, in purported proof that his signature was forged, Plaintiff has repeatedly signed his pleadings by *hand-printing* his signature and has occasionally drawn attention to the *printed* signature by noting that "*this* is my signature," (emphasis added) presumably purportedly attempting to disprove the authenticity of the cursive handwriting signatures on the signed "Refusal(s) to Consent to Treatment."  See ECF No. 9 at 1; ECF No. 10; ECF No. 19; ECF No. 38-2 at 2; ECF No. 43-1 at 1; ECF No. 45 at 17; ECF No. 49 at 3; ECF No. 50.  However, the undersigned notes that Plaintiff signed his original complaint [ECF No. 1 at 9, 10], his motion to proceed as a pauper [ECF No. 2], and his Consent to Collection of Fees from Trust Account in cursive handwriting [ECF No. 3], and those signatures match the signatures on the numerous

medical treatment refusal forms. ECF No. 33-4 at 1, 2; ECF No. 33-8 at 1; ECF No. 33-10 at 1; ECF No. 33-12 at 1; ECF No. 33-13 at 1; ECF No. 33-15 at 1, 2. The undersigned also notes that when Plaintiff was directed to sign a copy of the amended complaint he had filed, when he refiled the signed copy, he heavily scribbled out something on the signature line and then hand-printed his signature next to it; it would appear that he forgot and accidentally signed in his cursive handwriting, then realized his error, crossed it out, and printed the signature. See ECF No. 45 at 17.

Accordingly, this claim, too, has no support in the record, and is insufficient to raise a right to relief beyond the speculative level. It should be dismissed for failure to state a claim upon which relief can be granted.

### D. Insurance Fraud

Plaintiff alleges that the Defendants forged medical records to make it appear that he received treatment when he did not, and then billed his insurer (West Virginia Medicaid), thereby committing "insurance fraud."  ECF No. 45 at 8.   Defendants contend that Plaintiff's conclusory allegations, unsupported by facts, do not rise to the level of a plausible claim for relief, and therefore, this claim should be dismissed for failure to state a claim upon which relief can be granted. ECF No. 33 at 13 - 14. The undersigned agrees. Not only is there no support in the record for Plaintiff's claim that he did not receive treatment, an insurance fraud claim does not state a constitutional violation and is not even cognizable in a § 1983 action. Thus, the undersigned finds that Plaintiff's claim that any of the named Defendants committed "insurance fraud" by billing the state for care that was not provided fails to state a claim upon which relief can be granted.

### E. Medical Negligence

To the extent that a plaintiff seeks to establish a medical negligence claim, he must comply with West Virginia law and establish that:

> (a) the health care provider failed to exercise that degree of care, skill, and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances; and (b) such failure was a proximate cause of the injury or death.

W.Va. Code § 55-7B-3.

When a medical negligence claim involves an assessment of whether or not the plaintiff was properly diagnosed and treated and/or whether the health care provider was the proximate cause of the plaintiff's injuries, expert testimony is required. Banfi v. American Hospital for Rehabilitation, 529 S.E.2d 600, 605-606 (2000).

Additionally, under West Virginia law, certain requirements must be met before a health care provider may be sued. W.Va. Code § 55-7B-6. This section provides in pertinent part:

> **§ 55-7B-6**. Prerequisites for filing an action against a health care provider; procedures; sanctions.
>
> (a) Notwithstanding any other provision of this code, no person may file a medical professional liability action against any health care provider without complying with the provisions of this section.
>
> (b) At least thirty days prior to the filing of a medical professional liability action against a health care provider, the claimant shall serve by certified mail, return receipt requested, a notice of claim on each health care provider the claimant will join in litigation. The notice of claim shall include a statement of the theory or theories of liability upon which a cause of action may be based, and a list of all health care providers and health care facilities to whom notices of claim are being sent, together with a screening certificate of merit. The screening certificate of merit shall be executed under oath by a health care provider qualified as an expert under the West Virginia rules of evidence and shall state with particularity: (1) The expert's familiarity with the applicable standard of care in issue; (2) the expert's qualifications; (3) the expert's opinion as to how the applicable standard of care was breached; and (4) the expert's opinion as to how the breach of the applicable standard of care resulted in injury or death. A separate screening certificate of merit must be provided for each health care provider against whom a claim is asserted. The person signing the screening certificate of merit shall have no financial interest in the underlying claim, but may participate as an expert

25

witness in any judicial proceeding. Nothing in this subsection may be construed to
limit the application of rule 15 of the Rules of Civil Procedure.

This Court previously held that compliance with W.Va. Code §55-7B-6 is mandatary prior
to filing suit in federal court. See Stanley v. United States, 321 F.Supp. 2d 805, 806-807 (N.D.
W.Va. 2004).[13]

Here, it is apparent from the record that Plaintiff's complaint makes no claim of medical
negligence, only deliberate indifference. In his response in opposition to the Defendants'
dispositive motion which notes that Plaintiff did not comply with the WV MPLA by filing a pre-
suit notice of claim and screening certificate of merit before filing suit, Plaintiff merely rhetorically
asks how an inmate fighting cancer would know how to file a complaint with pursuant to the WV
MPLA. ECF No. 38 at 1. Nonetheless, given that Plaintiff has not even attempted to bring a
medical negligence claim, this claim will be given no further review.

## V. Recommendation

For the foregoing reasons, the undersigned recommends that Defendants' Motion to
Dismiss and Alternative Motion for Summary Judgment [ECF No. 32] be **GRANTED**, and
Plaintiff's signed Amended Complaint [ECF No. 45] be **DENIED and DISMISSED with
prejudice** for failure to state a claim upon which relief can be granted, pursuant to 28 U.S.C. §
1915(2)(B)(ii).

The parties are notified that this Report and Recommendation is hereby **FILED**, and a copy
will be submitted to the Honorable Thomas S. Kleeh, United States District Judge.  Pursuant to

---

[13] In Stanley, the plaintiff brought suit against the United States alleging that the United States, acting through its
employee healthcare providers, was negligent and deviated from the "standards of medical care" causing him injury.
The Court found that there was no conflict between the state pre-filing requirements and the pre-filing requirements
of the FTCA. More specifically, the Court concluded that the West Virginia pre-filing requirement is 'substantive'
[and] there is no conflict to be resolved between the federal and state pre-filing requirements. Although § 55-7B-6 is
more demanding [than] 28 U.S.C. § 2675(a) and its implementing regulations, there is nothing to prevent a plaintiff
from complying with both requirements." Stanley, 321 F.Supp.2d at 808-09.

the provisions of Title 28, United States Code, Section 636(b)(1)(B), Rules 6(d) and 72(b), Federal Rules of Civil Procedure, and Rules 1(b) and 8(b) of the Rules Governing Proceedings in the United States District Courts Under Section 2254 of Title 28, United States Code, **any party shall have fourteen days (filing of objections) and then three days (mailing/service), from the date of filing this Report and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Report and Recommendation to which objection is made, and the basis of such objection.** Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitations, consistent with LR PL P 12. Extension of this time period may be granted by the presiding District Judge for good cause shown.

**Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.** Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984). A copy of such objections shall be served on Judge Kleeh.

The Clerk is directed to mail a copy of this Report and Recommendation to the *pro se* Plaintiff by certified mail, return receipt requested, at his last known address as shown on the docket, and to transmit a copy electronically to all counsel of record.

Further, upon entry of this Report and Recommendation, the Clerk is also **DIRECTED** to terminate the Magistrate Judge's association with this case.

DATED:  June 25, 2019

/s/ *Michael John Aloi*
MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE